A. Harold Schmidt v. Commissioner. Albert H. Schmidt v. Commissioner.
Schmidt v. Commissioner
Docket Nos. 27355, 27356.
United States Tax Court
1951 Tax Ct. Memo LEXIS 213; 10 T.C.M. (CCH) 523; T.C.M. (RIA) 51160; May 31, 1951
Roy C. Hormberg, Esq., 1701 Bryant Bldg., Kansas City, Mo., and William H. Symon, Jr., Esq., for the petitioners. Marvin E. Hagen, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioners assail respondent's determination of income tax deficiencies in Docket No. 27355 of $9,532.88 and $5,136.02, and in Docket No. 27356 of $6,426.14 and $4,187.37, for the respective years 1944 and 1945. Petitioners do not contest certain adjustments and respondent concedes one issue. The question to be decided is whether gain realized on the sale of certain cattle and hogs is to be treated as ordinary income or capital gain. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found. Petitioners filed their returns with the collector of internal *214 revenue for the sixth district of Missouri. Petitioners, father and son, are equal partners in a farming, ranching, and livestock business. They operate ranches in several states, maintaining breeding herds of purebred cattle. They report inventories on the unit-livestock method, valuing all of their livestock according to age. Petitioners maintain a registered herd of purebred Aberdeen Angus cattle. For many years petitioners have maintained that breeding herd at substantially the same size. They raise steer calves for sale to feeders. In addition they add calves to their own breeding herd, and they sell registered cattle to other breeders. Petitioners are one of the largest breeders of registered Angus cattle in the United States, and their registered cows are in demand by other breeders. Petitioners keep detailed card files on all cattle fit for breeding purposes, setting forth their registration numbers, age, production record, and other pertinent data for identification. Individual identification records are not kept for the unregistered cattle since they are not used for breeding. The offspring of the breeding herd are usually born in the spring. During the fall of each *215 year, petitioners select and segregate the heifer calves considered fit for breeding purposes, which they register. Registration increases the value of cattle and their offspring, and the cost of registry rises after a heifer passes the age of 12 months. Some of the offspring retained for breeding purposes are sold to other breeders for profit. Heifers which do not mature and develop properly are sold. Until they are bred it is not known whether they will be productive. Petitioners usually breed heifers for the first time at ages between 18 and 24 months. During each of the years 1944 and 1945 the cows in the registered herd produced approximately 600 calves. In the fall of each of those years, most of the heifer calves were segregated and registered. Petitioners registered 396 and 390 head of cattle in the years 1944 and 1945, respectively. Some of the registered heifer calves were retained each year and ultimately used for breeding purposes. Many of the registered heifers were sold and at least 95 per cent of petitioners' sales of registered cattle were to other breeders. A few were sold on the feeder market. The following sales of cattle, held by petitioners for more than six *216 months, were made during the periods in controversy: 1944
Heifers or
Registered Cattle
Cows
Bulls
Other
Total
Gain
7 to 12 months (born during 1944)
256
3
259
$26,441.70
13 to 18 months
131
3
134
13,372.48
19 to 21 months
1
1
110.00
22 to 24 months
2
1
3
255.60
Over 24 months
54
15
69
5,103.88
444
22
466
$45,283.66
Unregistered Cattle
Heifers
8
Steers
124
Raised in 1944 (Steers and Heifers)
268
400
24,419.89
Total Cattle
866
$69,703.55
1945
7 to 12 months (born in 1945)
71
2
73
$10,825.00
13 to 18 months
8
1
9
1,055.00
19 to 21 months
6
3
9
1,215.75
22 to 24 months
7
7
14
1,927.02
Over 24 months
122
12
134
14,686.28
214
25
239
$29,709.05
Unregistered Cattle
Heifers
13
Steers
152
Raised in 1945 (Steers and Heifers)
252
417
$28,030.96
Total Cattle
656
$57,740.01
The inventories of registered cattle on hand at the beginning and end of the years in dispute are as follows: January 1, 1944
December 31, 1944
December 31, 1945
Cows or
Cows or
Cows or
Heifers
Bulls
Heifers
Bulls
Heifers
Bulls
Calves
381
24
132
329
17
Yearlings
99
97
9
72
7
2 yr. olds
67
25
21
92
3 yr. and older
897
67
936
51
839
48
Total
1444
91
1190
81
1332
72
*217 Petitioners maintain a herd of breeding hogs for the purpose of producing and raising hogs for slaughter. In 1944 petitioners sold 297 non-breeding hogs and in 1945 they sold 305 non-breeding hogs to packers. Petitioners sold, from their hog-breeding herd, 29 sows and 1 boar in 1944 at a profit of $896.33, and 26 sows and 1 boar in 1945 at a profit of $1,247.92, all animals having been held for more than six months. These animals were sold because they were undesirable for further use as breeding animals. Each sow had previously produced two or three litters. Petitioners do not usually retain breeding sows for more than four years. The sales in 1944 did not result in a reduction in the size of the breeding herd. The sales in 1945 reduced the size of the breeding herd by 25 hogs. Petitioners' tax returns reported the profit on the sale of unregistered cattle and non-breeding hogs as ordinary income, and the profit on the sale of registered cattle and breeding hogs as capital gain. Respondent's notices of deficiency determined, among other matters, that "the gain from the sale of livestock owned by the partnership does not constitute capital gain but ordinary income * * *." *218 The registered cattle aged more than 24 months and all of the breeding hogs were held by petitioners primarily for breeding purposes. The cattle aged 24 months and less, which were sold by petitioners during the taxable years, were held primarily for sale to customers in the ordinary course of business. Opinion Whether the cattle, sheep and hogs sold by petitioners are entitled to capital gain treatment under section 117(j) presents the now familiar question of the extent to which they were on the one hand a part of petitioners' breeding herds and merely removed or "culled" as no longer useful for breeding purposes, or on the other, property held by petitioners primarily for sale to customers in the ordinary course of their trade or business. ; , appeal dismissed, (C.A. 8) ; ; . Which of the animals in controversy were in fact a part of petitioners' breeding herds, a question which in our view is purely one of fact, we have determined *219 by our findings. Respondent has conceded the issue with respect to the sheep, and we find no basis upon which any serious question can be raised as to the hogs. The facts show that no sow was sold without producing at least two or three litters and that their desirability as breeding animals had come to an end. In addition, one boar was sold in each year for similar reasons. The picture with respect to the cattle is, however, quite different. Petitioners were obviously in the business of selling purebred cattle for breeding purposes, as well as breeding cattle themselves. Although their registration of the young cattle could, as they insist, operate to improve their value as additions to their own breeding herds, it could as well increase their salability to other farmers as breeding animals. Their activity in the sale of registered cattle was sufficiently extensive and continuous to conclude that this was a part of the ordinary course of their business. , cert. denied ; , cert. denied . The facts show that *220 although petitioners ordinarily bred their heifers at between 18 and 24 months of age, more than half of their sales of registered cattle in 1944 and almost a third in 1945 were of animals less than 12 months old. To these facts the language of Walter S. Fox, 16 T.C. - (Apr. 20, 1951), is peculiarly apposite: "It was petitioners' practice to register a large number of the cattle rasied at the farm. Registration usually occurred before the calf was six months old. Petitioners argue that upon registration these cattle automatically became part of their breeding herd despite that fact that the heifers could not be bred until 15 months old and the bulls 13 months old, and despite the further fact that a large part of the animals were regularly sold in the normal course of operations. * * *
"* * * We think the point is without merit for * * * these cattle were not purchased but were born and raised on petitioners' farm. Their presence there does not necessarily evidence an intention to use them in petitioners' business, i.e., to use them for breeding cattle, any more than it necessarily evidences an intention to sell them to customers. Furthermore, these cattle when registered *221 were not ready for use, nor could petitioners then determine that they would be when the proper time arrived. They were, at most, merely potential members of a herd. As we pointed out in our findings, experience has shown that a large number of the cattle were disposed of before they dropped a calf or even were bred. "The mere act of registration does not, in our opinion, establish that the calves became a part of petitioners' breeding herd, for registration was of equal importance in insuring a market for such stock as breeders. * * *". Applying a similar formula to that used in the Fox case, we have concluded, as our findings show, that only the animals over 24 months of age when sold are to be considered as having been part of the breeding herd. Although the evidence is not satisfactory with respect to petitioners' custom as to the sale of bulls, we have adopted the same method of determination as to them. The conclusion is that the remainder of the registered cattle which were sold, that is, those 24 months of age or less, were held primarily for sale to customers in the ordinary course of petitioners' trade or business and hence are not entitled to capital gain treatment *222 under section 117. Decision will be entered under Rule 50.